CLARKE v. CENTRAL RAILROAD & BANKING CO. OF GEORGIA et al. CENTRAL RAILROAD & BANKING CO. OF GEORGIA v. FARMERS' LOAN & TRUST CO. et al.  BROWN et al. v. CENTRAL RAILROAD & BANKING CO. OF GEORGIA.

(Circuit Court, E. D. Georgia, S. D.   June 30, 1893.)

1. RECEIVERS—MAY PROMOTE RAILWAY REORGANIZATION SCHEME.
    It is not improper for the receiver of a railway corporation to promote any reorganization scheme which offers the prospect of securing the largest measure of protection to all persons concerned in or connected with the property and assets in the custody of the court, but in so doing he must not promote one interest at the expense of others equally entitled to the court's protection.

2. RECEIVERS—REMOVAL—MISLEADING REPORTS.
    The receiver of a railway corporation should not be removed for making reports as to the condition of the property in his care, which are alleged to be misleading, and to depress its value in the estimation of the public, when it appears that he has continued the existing method of accounting and reports, without intentionally misstating or misrepresenting the company's true condition.

3. SAME—FRAUDULENT ACTS OF AGENT.
    The receiver of a railway corporation should not be removed on motion of a creditor because his agent has fraudulently permitted certain brokers to buy lumber at one price, and bill it to the corporation at a higher price, when it appears that he has used due care in the selection and supervision of his agents, and has discharged the wrongdoer as soon as he heard of the transaction.

4. SAME—LOW FREIGHT RATE TO INTRODUCE NEW PRODUCT.
    The receiver of a railway corporation may properly, in the exercise of his business judgment, give an unusually low rate, in order to introduce into general use a cheap and valuable article, which, if brought into general demand, would add to the freight receipts of the roads handling it.

5. SAME—RESPONSIBILITY FOR WRONGFUL ACTS OF OTHERS.
    The receiver of a railway corporation should not be discharged on motion of a creditor because labor paid for by the corporation has been used by private parties for their advantage, when it is not alleged or shown that he either knew of or consented to such use.

6. SAME—BREACH OF TRUST—CONTRACTS WITH INTERESTED PARTIES.
    It is improper for the receiver of a railway corporation to procure supplies from or enter into contracts with a company composed of the superintendent and other officials of the railway.

7. SAME—RESPONSIBILITY FOR BREACH OF TRAFFIC AGREEMENT.
    The receiver of a railway corporation should not be discharged on motion of a creditor because a competing line has for a considerable time broken the traffic agreement between the two roads, when it appears that he has upon discovery of this state of facts taken successful steps to put an end to it.

In Equity.   Bill by Rowena M. Clarke, the Farmers' Loan & Trust Company, and Alexander Brown & Sons against the Central Railroad & Banking Company of Georgia.   For prior opinion, see 50 Fed. 338, and 54 Fed. 556.   Heard on motion by Alexander Brown & Sons to remove H. M. Comer from the receivership. Denied.

Calhoun, King & Spalding, Leopold Wallace, and M. C. Butler, for the motion.

Lawton & Cunningham, Denmark & Adam, and N. J. & T. D. Hammond, opposed.

Before JACKSON, Circuit Justice, and SPEER, District Judge.

JACKSON, Circuit Justice. The receiver is criticised for his connection with and approval of the Hollins & Co. scheme of reorganization, and is charged with the making of reports and representations as to the condition of the Central Railroad, which, it is claimed, have been misleading, and have had the effect to unduly depress the value of its properties and assets. These and certain specific acts of mismanagement constitute the general and special grounds on which the application for his removal is based.

It is not improper for a receiver, in cases like the present, to advise, aid, and encourage reorganization schemes, which offer the prospect of securing the largest measure of protection to the various interests connected with or concerned in the property and assets in the custody of the court, and in the possession of such receiver, for administration and distribution. If the court said anything at Atlanta that was construed to be in conflict with this proposition or idea, it made a wrong impression. What the court intended to say at Atlanta, and what it means to say here and now, is that its receiver, as an officer of the court, should not become a partisan in favor of any particular interests or classes; that he should not so administer his trust as to represent and promote, either in his dealings with the property or in schemes of reorganization, one interest at the expense or to the prejudice of other interests equally entitled to the consideration and protection of the court and its officers; that it was the duty of the receiver, as it was the duty of the court, to act impartially as between all interests. While this is his duty, it is right and proper, and the circuit justice has instructed the receiver (as he wishes the counsel to know) that he may with propriety and in the line of his duty endeavor to bring together the various conflicting interests here involved on some equitable basis or plan that will protect the properties and assets of the Central Railroad from wreck and ruin, and, as far as possible, save the debenture holders, general creditors, and stockholders from loss, or reduce their loss to the lowest minimum; that he could by advice and suggestions aid and encourage a reorganization scheme or schemes which would bring together the interests represented by the Farmers' Loan & Trust Company, the Central Trust Company, the Terminal Company, Hollins & Co., Drexel, Morgan & Co., the Southwestern Railroad Company, the Augusta & Savannah Railroad Company, and any and all other interested parties, including the Central Railroad, and hold out the prospect of affording the largest measure of security and protection to all concerned, and according to their respective rights, but that in doing this his action or actions should be impartial as between all interests. He may not, in his official

character, favor a particular interest at the expense or to the detriment of another. If, in his approval and encouragement of the Hollins & Co. plan of reorganization, he has departed from this rule, he has done wrong. But after a careful examination of his conduct in relation to the Hollins & Co. transaction, and the scheme of reorganization they formulated, I see no evidence of partisanship on the part of the receiver. I fail to discover that in his approval of that scheme, and in his recommendation of its adoption, he was seeking to promote any interest at the expense or to the hurt and injury of other interests. The court may be permitted, after a thorough investigation of the situation, and the condition of the Central Railroad, to say that, in its opinion, it is a great misfortune that the Hollins plan of reorganization could not be carried out. An examination of that scheme since the matter was up at Atlanta has convinced the court that it would have afforded a larger measure of protection to unsecured creditors and stockholders than can be secured or realized from a foreclosure sale without some such scheme to prevent a sacrifice of the property. That scheme provided for the floating debt of the Central Railroad and its stockholders, or the greater portion of them. It did not provide for the Macon & Northern and other bonds on which the Central Company was guarantor, but those bonds had independent security, and, after exhausting such security, could have reached and subjected any surplus proceeds that might have been realized from the sale of the Central's properties and assets. The court does not mean to say that the holders of those guarantied bonds should not have been taken into the scheme of reorganization, and been provided for on some equitable basis, but merely that, in view of the situation, and the condition of the Central's properties and affairs, it is likely to prove unfortunate for the debenture holders, the floating creditors, and the stockholders of the Central Railroad that said scheme could not be carried out. This will be the result inevitably unless the various interests concerned shall come together on some equitable plan of reorganization, which shall seek to protect and promote all interests in the order of their relation and respective rights. Individually and as a court I trust that this may be done. I have expressed my opinion about this Hollins scheme as a business man, after understanding the situation of the property which the court is called upon to administer. There is nothing connected with its approval for which the receiver should be censured or be removed.

In respect to the receiver's reports and representations as to the condition of the Central's properties and assets, which it is said were misleading, and had the effect to unduly depress the value thereof in the estimation of the public, I find that the receiver has adhered to the same method of keeping his accounts and making his reports which prevailed when the railroad was in charge of its directory, and I fail to discover that he has intentionally misstated or misrepresented the company's true condition and situation. I have gone carefully over the reports of the company since 1887, examined its assets, and the earnings and expenses, not only of

the main line, but of the leased and auxiliary lines, year by year since that date, and as the result of that examination I am of opinion that the receiver is not fairly chargeable with any failure or neglect in making correct representations as to the condition of the Central Company. He is certainly not responsible in any way for the condition in which he found its properties and assets in 1892, when he took charge of the same.

Let us now come to the specific instances of mismanagement that are brought against him. First, in reference to the purchases of lumber, which certain brokers of this city have bought at one price and billed to the Central Company or to the receiver at another and larger price. This transaction seems to have been done, or permitted to be done, by an agent—perhaps a purchasing agent—of the receiver. It was promptly disapproved by the receiver as soon as it came to his knowledge, and the agent who did it or permitted it was discharged. The receiver is compelled, like the directory of a railroad, to act largely through agents. Neither the directory of the road nor the receiver of the court is to be held responsible for the fraudulent acts or misconduct of subordinate employés in a system like this of 2,600 miles, when the principal's personal presence and actual inspection, day by day, of any agent's actions and transactions, is a physical impossibility. No management could meet such a responsibility as that. Acts of misconduct may be committed by agents here and there without blame or any fault or want of proper care on the part of the receiver. A ticket agent at a distant point, or even at the home office, may commit acts of embezzlement for a series of days. Is it to be expected that the receiver is to be held responsible for such acts because he did not discover them as soon as committed? Is the failure to promptly discover misconduct in subordinates, widely scattered, and discharging different functions, evidence of either incapacity or mismanagement? It is not claimed or pretended that the receiver in any way sanctioned the acts complained of; on the contrary, it is conceded that, upon discovering the same, he promptly dealt with the wrongdoer. All that could be demanded of him was the exercise of care in the selection of agents, and diligence in looking after them and the business intrusted to them. I suppose the receiver has thousands of agents or subordinates over this large system of 2,600 miles. It would be a physical impossibility for him to supervise the daily transactions of every agent in his employment, and it involves no just charge of mismanagement that corrupt acts or misconduct of such subordinates take place and run on for a time before being discovered. The receiver's responsibility would commence with such discovery, and he would be censurable and to be blamed if, after learning the facts, he continued to employ the wrongdoer. The receiver has not subjected himself to censure on the latter ground, and his failure to discover the transactions complained of sooner than was done does not establish want of good management. This charge against the receiver is not well taken.

The matters connected with the chert mine do not in any way involve the receiver. In order to introduce the product of this mine

into the markets along the lines of his road he has given a special freight rate, which is said to be too low. But this is a matter of business judgment, and is not shown to have been wrongly exercised. The chert is likely to prove a cheap and valuable material for paving purposes, and, if brought into demand, would add to the freight receipts of the road or roads handling it. But it is alleged that there is a company, called the Drawbar Company, the incorporators and members of which are the superintendent and other officials of the railroads under the receiver, and that said company, or some of its members, have been using the labor of the railroad company, or that in the employ of the receiver, in working and operating said chert mine. It is not alleged or shown that the receiver either knew of or consented to this use of the laborers in his employment. If it has occurred, he is not responsible therefor, so far as anything appears from the statement of counsel. If the Drawbar Company, or the members thereof, have used the laborers of the Central Railroad or of the receiver in operating or working said mine, it or they will be held responsible for the payment of proper compensation for such labor. If any officer or employé of the railroad or of the receiver has acted in this manner, the court will order his or their discharge from the employment of the receiver, as well as hold them responsible for the payment of the proper compensation for the labor employed. The court does not assume that the superintendent or any other member of said Drawbar Company has used the labor force of the receiver for private purposes. It would be unjust to them to assume that as a fact, or express any opinion on the subject, without giving them a full hearing and opportunity to answer the charge. If there is any place in the world where an individual ought not to be struck at without a hearing it is in a court of justice. What the court means to say is that, if the statement made to the effect that laborers of the receiver have been employed by said Drawbar Company or its members for their private benefit were true, said company or the members thereof engaged in such acts should and would be made responsible therefor.

It is proper, while on this subject, to say further that, if said Drawbar Company is composed of the superintendent and other officials of the railroad in the employ of the receiver, it would not be proper for the receiver to deal with said company in the way of procuring from it supplies or entering into contracts with it. Parties owing duties to the railroad by reason of their official relations thereto, and connected therewith, could not be permitted to deal, directly or indirectly, through the form of a company with the receiver, in respect to subjects or articles they might have to sell or contract about. Upon well-settled principles this could not be tolerated by the court. The dual trust relation occupied by parties in such situations would forbid such transactions. But the receiver has had no connection with the company, and, so far as appears, is in no way responsible for its organization or acts.

The next objection urged against the receiver is his relation to the South Bound Railroad, and his action in not making switching charges against that company at Savannah. Under the terms of

the contract made and entered into between the Richmond & Danville Railroad Company and the South Bound Railroad, which has been acquiesced in and practically continued in operation by the Central Railroad since the Richmond & Danville surrendered the possession thereof, in March, 1892, I am inclined to think the South Bound road, or the president thereof (who, I understand, is a different person from the receiver of the Central Railroad), could reasonably claim and demand that the Central should switch the former's cars at Savannah without charge.    The contract fairly admits of this construction, and the receiver is not censurable for yielding to the demand.    Neither is he to blame for the fact, if it be a fact, that during one period the South Bound brought about 17,000 bales of cotton from Augusta to Savannah, while the Central Railroad, during the same period, brought only 16,000.    When the receiver discovered that the South Bound road was bringing more than its proportion or share of cotton from Augusta under the traffic arrangement existing between the two roads, he took the necessary steps to change that result, and promptly effected such change.    This transaction discloses no mismanagement on the part of the receiver.

In the management of these extensive properties it is a great deal easier to look back and find faults than it is to guard in advance against mistakes.    I see things in this case that I disapprove.    Some things have been done that were not the best under the circumstances, but, after a careful consideration of the situation, I do not see that the receiver is to be blamed therefor.    He has made some contracts which, in the light of subsequent events, it would have been better if they had not been entered into,—contracts which I would not perhaps have sanctioned; but, as far as I can see and judge, they were made in the exercise of an honest purpose and intention.    There is no evidence of any corruption or intentional misconduct.    There is evidence of deep interest and concern in the welfare of the interests committed to his management. If mistakes have been committed by the court in directing and authorizing certain transactions by the receiver, it would be cowardly and unjust to make the receiver the scapegoat, and put on him the blame and responsibility therefor.    The court must assume its share of responsibility for whatever has been done in an improper or wrongful manner by its sanction or direction.    Having carefully examined into the receiver's conduct and actions I find no corruption, no willful or intentional misconduct, and no such mismanagement as will warrant the court in directing his removal.    The motion to discharge the receiver is overruled and denied.    In view of the decree of sale, and its probable execution in six months, it is not perceived that any good result could or would follow a change of administration.    I doubt whether any single individual in the country could take charge of the properties in question, and relieve the embarrassed situation, or do much better than the present receiver is now doing; but, aside from this, no sufficient cause is shown for discharging the receiver.